# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-18-00239-CR[1]

**Edward Joseph Osuna, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF BELL COUNTY, 27TH JUDICIAL DISTRICT NO. 73618, THE HONORABLE JOHN GAUNTT, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant Edward Joseph Osuna guilty of burglary of a habitation. *See* Tex. Penal Code § 30.02(a)(3). Appellant elected to have the trial court decide his punishment, *see* Tex. Code Crim. Proc. art. 37.07(2)(b), and the trial judge assessed appellant's punishment, enhanced pursuant to the habitual offender provision of the Penal Code, at confinement for 25 years in the Texas Department of Criminal Justice, *see* Tex. Penal Code § 12.42(d). In three points of error, appellant complains about error in the jury charge and challenges the imposition of court costs. We find no reversible error. However, we have found non-reversible error in the written judgment of

---

[1] The notice of appeal in this case was originally filed in this Court on March 16, 2016. The Supreme Court of Texas ordered the case transferred to the Eighth Court of Appeals pursuant to its docket equalization authority. *See* Tex. Gov't Code § 73.001; Misc. Docket No. 16-9040 (Tex. Mar. 22, 2016) (per curiam). This Court transferred the case to our sister court on April 11, 2016. On April 12, 2018, the Supreme Court of Texas ordered that this case, along with certain other cases, be transferred back to this Court from the Eighth Court, and we consider this appeal pursuant to that order. *See* Misc. Docket No. 18-9054 (Tex. Apr. 12, 2018) (per curiam).

conviction. We will modify the judgment to correct the clerical error and, as modified, affirm the trial court's judgment of conviction.

## BACKGROUND[2]

The jury heard evidence that Amy Mikulec and her fiancé, Luke Carrell, lived in a mobile home owned by Amy's parents, Jennifer and Danny Mikulec, on fenced-off property also owned by Jennifer and Danny. In September of 2014, Amy and Luke were in the process of moving out but still had most of their clothing and property in the mobile home. During that time, a neighbor who lived across the road, Larry Worsham, saw a man several times inside the fenced-off property.

The first time Worsham noticed the man, he was pushing a bike across the "pasture part" of the property. The man was "going the other way," so Worsham "didn't do anything at that time, didn't say anything." A couple of days later, Worsham again saw the man. This time he was pushing the bike through the gate, coming off of the property. Worsham confronted the man, who told Worsham that he was "just riding across the field" and that "he was kind of keeping an eye on the property because he had heard there had been some trouble over there." At trial, Worsham identified appellant as the man that he saw pushing the bike off of the property. Worsham testified that on that occasion, he told appellant that he was on private property and needed to leave. A few days later, Worsham again saw appellant. He was sitting between the ditch and the road "just looking at the property over there" (the Mikulecs' property). Worsham did not talk to appellant on that occasion. Then, on September 10th, Worsham was on his porch and heard Luke's truck start

---

[2] The facts recited in this opinion are taken from the testimony and exhibits admitted at trial.

2

up. The truck was inside the gated and fenced property. He saw that the driver was wearing Luke's camouflaged jumpsuit and assumed it was Luke. However, a short time later, as he observed the driver walking around, Worsham realized that it was not Luke. Worsham confronted the man—the same man from the previous encounters, whom Worsham had identified as appellant—about being on the property. Appellant claimed that he was "taking care of some stuff" for Amy and Luke and that Amy "had hired him to watch the place." Worsham left the property and called Luke to apprise him of the situation.

Luke, who was three hours away in Smithville, called Jennifer because she lived in town, and she went to the property. When Jennifer got to the property, she saw Worsham and "a gentleman sitting on the front porch of the trailer house" whom she had never seen before.[3] Jennifer asked the man who he was, and he told her his name. In court, Jennifer identified appellant as the man from the porch. She explained that she asked appellant why he was there and what business he had there. Appellant told her that "he had authorization to be there, that he was watching over the place for the owners." Jennifer asked him who gave him that authorization, and he told her that Luke and Amy had given him authorization to be there. She confronted appellant and told him that nobody had given him authorization to be there. She explicitly testified that she had not given appellant authorization to be there. Appellant, however, "tr[ied] to justify that he was where he was supposed to be." Jennifer called her husband, Danny, because she had to go work and "thought he needed to be there as well." While she waited for her husband, Jennifer called Luke to ask him if

---

[3] The record reflects that Worsham had returned to the mobile home after calling Luke because Luke had told him that Jennifer was coming to the property.

he had given anybody authorization to be at the mobile home. Luke informed her that he had not. When Danny arrived at the property, Jennifer left for work.

Danny testified that he also confronted appellant about his presence on the property and in the mobile home. Appellant told him that Amy had given him permission to live there to take care of the place. Danny did not believe appellant because, according to Danny, Amy and Luke would not have given permission for anyone to live there since Danny and Jennifer "own[ed] the place." Danny took a set of keys from appellant and then called the sheriff. The keys Danny took from appellant were the keys to the mobile home and the keys to Luke's truck.

Several sheriff's deputies responded to the mobile home. The first deputy, Corporal Rene DeLaRosa, made contact with appellant, asking appellant his name, which appellant provided. The deputy also asked appellant "what he was doing" and "where he lived." In response to the question about where he lived, appellant told the deputy that "only the higher above know [sic]." Corporal DeLaRosa also asked appellant where he had obtained the keys, and appellant said that he got them from Amy that morning. The deputy asked Danny to call Amy to ask if she had given appellant the keys. Danny called his daughter, and Amy told him that she did not know appellant, did not give him the keys, and did not give him permission to live there. At that point, Corporal DeLaRosa detained appellant to conduct a burglary investigation. As part of the investigation, several deputies went inside the mobile home. They observed that the TV was on, candles were lit, and clothes were scattered all over. Deputies located a wallet on the coffee table in the living room, which had appellant's identification inside. Appellant was then arrested. At the time of his arrest, appellant was wearing a military-type camouflage jumpsuit, similar to the ones strewn about the inside of the mobile home.

4

Amy and Luke testified about what they found upon their return to the mobile home after appellant was arrested and removed from the property. Amy said that she returned the next day and found "a mess" inside; it appeared that somebody had "rifled through [their] stuff." Their belongings were out of place, "all over the floors" so that "you could barely even walk." According to Amy, things that had been hanging on the wall had been removed and "new stuff" had been hung. Similarly, Luke testified that "every room in the trailer" was "trashed" and "tossed upside down." He explained that his military clothing, which had been packed together in a duffle bag in the closet of the spare bedroom, was all over the house. The record reflects that the clothing that appellant was wearing when he was arrested, military coveralls, belonged to Luke. Both Amy and Luke expressed that they had not left the mobile home in that condition. They also explained that their home was normally kept locked. Amy said that both the front and back doors were locked when she left. She had one set of keys to the residence with her, and the other set was in the master bedroom with the keys to Luke's truck.

Amy and Luke also testified that they discovered that items had been taken from their home. They provided a list of the missing items to the sheriff's office. Subsequently, the couple identified several property items that had been taken but had been recovered by the sheriff's department.[4] Justin Kelly, the detective assigned to conduct the follow-up investigation, talked to

---

[4] These recovered items included Luke's mechanics t-shirt from his bedroom closet, a PlayStation 3 game console from under the TV in the living room, a drill from a "junk drawer" in the kitchen, Luke's military-issued tanker boots from the duffle bag in the spare bedroom closet, a showerhead from under the bathroom sink, a stack of Luke's non-military-issued clothing from his bedroom closet, Luke's coin collection from the master bedroom, Luke's socks from his dresser drawer as well as a game camera (for deer and other animals), several DVDs, a lock and several lock sets, several phone cases, a gym bag, a pillow case, a lantern, smoking pipes, several lighters, a butane torch, and a set of rabbit-ear antenna, all of which were removed from inside the mobile home. A

appellant after his arrest. Investigator Kelly subsequently went back to the property and recovered the missing property items in a gym bag and pillowcase near the fence line hidden in some brush.[5]

Finally, in their testimony, both Amy and Luke expressed that they did not know appellant, did not give him permission to be on the property, and did not give him permission to be in the mobile home. In addition, Luke stated that he had not given appellant permission to wear his clothes, drive his truck, or take any items or clothing from the mobile home.

The State called eight witnesses at trial—Worsham, Jennifer, Danny, Amy, Luke, Corporal DeLaRosa, Deputy Staton, and Investigator Kelly—who testified to the above facts. Appellant did not testify at trial or call any witnesses on his behalf. However, he was permitted, over the State's objection, to cross examine Deputy Staton and Investigator Kelly about statements that appellant had made to them. In these statements, appellant claimed that he was riding his bike past the mobile home and saw an open door; that he became suspicious that the home had been burglarized so he went inside to investigate; that he did not know who lived there; that he did not have permission to be inside the home; that once he was inside he found some clothing, which he changed into because his clothes were dirty; and that he found the keys to the mobile home and the truck on the front lawn.

At the conclusion of trial, the court's jury charge instructed the jury regarding convicting appellant of burglary of a habitation or, if not, the lesser included offense of criminal

---

platinum baby ring, personal paperwork, savings bonds, and an air rifle were also on the list of missing items provided to the sheriff's office, but these items were not among the recovered property.

[5] Both Amy and Luke testified that the black Adidas gym bag belonged to Amy and that the pillowcase had been removed from their bed.

trespass. The jury found appellant guilty of burglary of a habitation. Because appellant had elected to have the court assess punishment upon a jury finding of guilt, the jury was released after returning the guilty verdict. Appellant pled true to the enhancement paragraphs of the indictment, and the trial court ordered a presentence investigation. Subsequently, the trial court sentenced appellant to serve 25 years in prison.

## DISCUSSION

Appellant raises three points of error. In his first point of error, he complains about error in the jury charge and contends that he suffered egregious harm as a result. In his second and third points of error, appellant challenges the imposition of court costs against him.

### Jury Charge Error

Appellant was charged by indictment with the offense of burglary of a habitation. Specifically, the indictment alleged that appellant

> did then and there intentionally or knowingly enter a habitation, without the effective consent of Jennifer Mikulec, the owner thereof, and attempted to commit or committed theft of property, to-wit: clothing, owned by Luke Carrell[.]

In his first point of error, appellant asserts that the trial court erred by failing to properly tailor the definitions of the culpable mental states in the jury charge to the applicable conduct elements of the offense.

We review alleged jury charge error in two steps: first, we determine whether error exists; if so, we then evaluate whether sufficient harm resulted from the error to require reversal.

7

*Arteaga v. State*, 521 S.W.3d 329, 333 (Tex. Crim. App. 2017); *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005). The degree of harm required for reversal depends on whether the jury charge error was preserved in the trial court. *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016); *see Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g) (setting forth procedure for appellate review of claim of jury charge error). If the jury charge error has not been properly preserved by an objection or request for instruction, as it was not here, the error must be "fundamental" and requires reversal only if it was "so egregious and created such harm that the defendant was deprived of a fair and impartial trial." *Marshall*, 479 S.W.3d at 843; *accord Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015); *Almanza*, 686 S.W.2d at 171.

A trial court is statutorily obligated to instruct the jury on the "law applicable to the case." *See* Tex. Code Crim. Proc. art. 36.14; *Arteaga*, 521 S.W.3d at 334. Each statutory definition that affects the meaning of an element of the offense must be communicated to the jury. *Villarreal v. State*, 286 S.W.3d 321, 329 (Tex. Crim. App. 2009); *Arline v. State*, 721 S.W.2d 348, 352 n.4 (Tex. Crim. App. 1986). The jury charge should tell the jury what law applies and how it applies to the case. *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007). The trial court's duty to instruct the jury on the "law applicable to the case" exists even when defense counsel fails to object to inclusions or exclusions in the charge. *Vega v. State*, 394 S.W.3d 514, 519 (Tex. Crim. App. 2013); *Taylor v. State*, 332 S.W.3d 483, 486 (Tex. Crim. App. 2011). The trial court is "ultimately responsible for the accuracy of the jury charge and accompanying instructions." *Vega*, 394 S.W.3d at 518 (quoting *Delgado*, 235 S.W.3d at 249); *Taylor*, 332 S.W.3d at 488.

The Penal Code delineates three "conduct elements" that can be involved in an offense: (1) the nature of the conduct, (2) the result of the conduct, and (3) the circumstances surrounding the

8

conduct. *McQueen v. State*, 781 S.W.2d 600, 603 (Tex. Crim. App. 1989); *see Robinson v. State*, 466 S.W.3d 166, 170 (Tex. Crim. App. 2015) ("Result-of-conduct offenses concern the product of certain conduct. Nature-of-conduct offenses are defined by the act or conduct that is punished, regardless of any result that might occur. Lastly, circumstances-of-conduct offenses prohibit otherwise innocent behavior that becomes criminal only under specific circumstances." (citing *Young v. State*, 341 S.W.3d 417, 423 (Tex. Crim. App. 2011))); *see also* Tex. Penal Code § 6.03. An offense may contain any one or more of these "conduct elements," which alone or in combination form the overall behavior that the Legislature has intended to criminalize, and it is those essential "conduct elements" to which a culpable mental state must apply. *McQueen*, 781 S.W.2d at 603. Thus, the statutory definitions of the culpable mental state in a jury charge must be tailored to the conduct elements of the offense. *Price v. State*, 457 S.W.3d 437, 441 (Tex. Crim. App. 2015); *Cook v. State*, 884 S.W.2d 485, 487 (Tex. Crim. App. 1994).

In the abstract portion of the court's jury charge, the trial court defined the indicted burglary offense as follows: "A person commits the offense of Burglary of a Habitation if, without the consent of the owner, he intentionally or knowingly enters a habitation and commits or attempts to commit theft." *See* Tex. Penal Code § 30.02(a)(3). The trial court then provided the following definitions regarding the culpable mental states "intentionally" and "knowingly":

> A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.
>
> A person acts knowingly or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or

9

with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

These definitions track the statute and encompass all the "conduct elements."[6] *See id.* § 6.03.

Appellant asserts that the offense of burglary of a habitation involves multiple conduct elements. He contends that entry element involves the "nature of conduct" and that the "lack of effective consent" element involves "the circumstances surrounding the conduct." Thus, he maintains that the definitions of intentionally and knowingly should have been tailored in the jury charge as it relates to these two elements, and the trial court's failure to do so was error.[7]

However, the Court of Criminal Appeals has concluded that "enters a habitation" is a "result of conduct" element, while "without the effective consent" is a "circumstance surrounding

[6] Although, because the statutory definition of "intentionally" contains no provision for circumstances surrounding conduct (unlike the statutory definitions of "knowingly" and "recklessly"), *see* Tex. Penal Code § 6.03; *Robinson v. State*, 466 S.W.3d 166, 172 (Tex. Crim. App. 2015), the definition of "intentionally" given by the trial court did not include any language regarding the circumstances of the conduct.

[7] In his brief, appellant suggests that the trial court should have charged the jury regarding the culpable mental states and relevant conduct elements as follows:

The following definition applies to [the] mental state in entering a habitation:

A person acts "intentionally" or with intent, with respect to the nature of his conduct when it is his conscious objective or desire to engage in the conduct.

A person acts "knowingly" or with knowledge, with respect to the nature of his conduct when he is aware of the nature of his conduct.

The following definition applies to [the] mental state in acting without effective consent:

A person acts "knowingly" or with knowledge, with respect to circumstances surrounding his conduct when he is aware that the circumstances exist.

10

the conduct" element. *Patrick v. State*, 906 S.W.2d 481, 492 (Tex. Crim. App. 1995); *accord*

*Williams v. State*, No. 12-14-00186-CR, 2015 WL 4119564, at *7 (Tex. App.—Tyler July 8, 2015,

pet. ref'd) (mem. op., not designated for publication); *see Crawford v. State*, No. 05-13-01494-CR,

2015 WL 1243408, at *2 (Tex. App.—Dallas Mar. 16, 2015, no pet.) (mem. op., not designated for

publication) ("Burglary contains both result-of-conduct (enters a habitation) and circumstances-

surrounding-conduct (without effective consent) elements."). Further, the indictment here alleged

that appellant entered the habitation and attempted to commit or did commit theft of property. Theft

involves a "nature of the conduct" element. *See* Tex. Penal Code § 31.03(a) (person commits theft

if "he unlawfully appropriates property with intent to deprive the owner of property"); *Mills v. State*,

722 S.W.2d 411, 415 (Tex. Crim. App. 1986) ("The gravaman of the offense [of theft] remains the

penalization of unlawful *acquisitive conduct*. Accordingly, the 'nature of the forbidden conduct' under

theft . . . is appropriation of property."); *Herrera v. State*, 527 S.W.3d 675, 678 (Tex. App.—Houston

[14th Dist.] 2017, pet. ref'd) ("unlawful appropriation is a nature-of-conduct element"); *Baltierra*

*v. State*, No. 05-10-01104-CR, 2012 WL 677514, at *2 (Tex. App.—Dallas Mar. 2, 2012, no pet.)

(mem. op., not designated for publication) ("The phrase 'unlawfully appropriate[d]' in the statutory

definition of theft refers to the nature of the conduct."). Thus, the offense as charged in this case

involves all three conduct elements. Therefore, the definitions were correct in that the definition

of "intentionally" included language regarding the nature of the conduct as well as the result of the

conduct and the definition of "knowingly" included language regarding all three conduct elements.

However, we agree with appellant that the definitions should have been tailored so

that the appropriate statutory culpable mental state definition was applied to the relevant conduct

11

element of the offense. *See Price*, 457 S.W.3d at 441; *Cook*, 884 S.W.2d at 487. A trial court errs when it fails to limit the definitions of the culpable mental states to the conduct element or elements involved in the particular offense. *Price*, 457 S.W.3d at 441; *Patrick*, 906 S.W.2d at 492; *Cook*, 884 S.W.2d at 491. Accordingly, the trial court here erred in failing to tailor the definitions of the culpable mental states to the relevant conduct elements of the offense.

Having found error in the jury charge, we must next consider whether appellant was harmed by the error. Appellant concedes that he did not object at trial to the non-tailored definitions of the culpable mental states in the jury charge. Consequently, the jury charge error was not preserved, and reversal is required only if the error was "fundamental" in that it was "so egregious and created such harm that the defendant was deprived of a fair and impartial trial." *See Marshall*, 479 S.W.3d at 843; *Villarreal*, 453 S.W.3d at 433; *Almanza*, 686 S.W.2d at 171; *see also State v. Ambrose*, 487 S.W.3d 587, 595 (Tex. Crim. App. 2016) (reaffirming that under precedent of Court of Criminal Appeals, unpreserved jury charge error does not require new trial unless error causes "egregious harm").

Jury charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. *Arteaga*, 521 S.W.3d at 338; *Marshall*, 479 S.W.3d at 843; *Arrington v. State*, 451 S.W.3d 834, 840 (Tex. Crim. App. 2015). "Egregious harm is a 'high and difficult standard' to meet, and such a determination must be 'borne out by the trial record.'" *Villarreal*, 453 S.W.3d at 433 (quoting *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013)); *see Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013) ("[Egregious harm] is a difficult standard to meet and requires a showing that the defendants were

12

deprived of a fair and impartial trial."). We will not reverse a conviction unless the defendant has suffered "actual rather than theoretical harm." *Villarreal*, 453 S.W.3d at 433; *see Marshall*, 479 S.W.3d at 843 ("[C]ourts are required to examine the relevant portions of the entire record to determine whether appellant suffered actual harm, as opposed to theoretical harm, as a result of the error."); *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011) ("An egregious harm determination must be based on a finding of actual rather than theoretical harm.").

In examining the record to determine whether jury charge error has resulted in egregious harm, we consider (1) the entirety of the jury charge, (2) the state of the evidence, including the contested issues and weight of probative evidence, (3) the arguments of counsel, and (4) any other relevant information revealed by the trial record as a whole. *Arteaga*, 521 S.W.3d at 338; *Marshall*, 479 S.W.3d at 843; *Villarreal*, 453 S.W.3d at 433; *Almanza*, 686 S.W.2d at 171. The analysis is "fact specific and is done on a 'case-by-case basis.'" *Arrington*, 451 S.W.3d at 840 (quoting *Gelinas v. State*, 398 S.W.3d 703, 710 (Tex. Crim. App. 2013)).

*Entirety of the Jury Charge*

In considering the jury charge as a whole, when the error involves a misstatement of the required culpable mental state, we "may consider the degree, if any, to which the culpable mental states were limited by the application portions of the jury charge." *Hughes v. State*, 897 S.W.2d 285, 296 (Tex. Crim. App. 1994); *Cook*, 884 S.W.2d at 492 n.6. In this case, although the trial court gave incorrect non-tailored definitions of the culpable mental states in the abstract portion of the charge, the court's instruction in the application paragraph properly applied the law to the factual context. The trial court instructed the jury as follows:

13

Now bearing in mind the foregoing instructions, if you believe from the evidence beyond a reasonable doubt, that the Defendant, [appellant], on or about the 10th day of September, 2014, in the County of Bell, and State of Texas, as alleged in the indictment did then and there *intentionally or knowingly enter a habitation, without the effective consent of Jennifer Mikulec, the owner thereof, and attempted to commit or committed theft of property*, to-wit: Clothing, owned by Luke Carrell, you will find the Defendant "Guilty" of the offense of Burglary of a Habitation and so say by your verdict, but, if you do not so believe, or if you have a reasonable doubt thereof, you will acquit the defendant of the offense of Burglary of a Habitation and next proceed to consider whether the defendant is guilty of the lesser included offense of Criminal Trespass of a Habitation.

The effect of the instruction, based on the grammar and sentence structure, was that the jury was instructed that it could convict appellant of burglary of a habitation only if it found that he had intentionally or knowingly caused the result (entered the habitation), did so under the requisite circumstances of the conduct (without the effective consent of the owner of the habitation), and intentionally or knowingly engaged in the nature of the conduct (attempted to commit or committed theft, which is the unlawful appropriation of property). This instruction is consistent with the statutorily prohibited conduct. *See* Tex. Penal Code § 30.02(a)(3); *see also Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999) ("Where the application paragraph correctly instructs the jury, an error in the abstract instruction is not egregious."). Furthermore, "[a]lthough the definitions of 'intentionally' and 'knowingly' indiscriminately set forth the three alternative conduct elements, when those terms are viewed in their factual context, it becomes apparent which conduct element applies to which element of the offense." *See Hughes*, 897 S.W.2d at 296; *see also Patrick*, 906 S.W.2d at 493 ("We conclude that because the facts, as applied to the law in the application paragraph, pointed the jury to the appropriate portion of the definitions, no harm resulted from the

14

court's failure to limit the definitions of culpable mental states to proving the conduct element of the underlying offense.").

Accordingly, we conclude that consideration of the entirety of the jury charge, as applied in the factual context of this case, weighs against a finding of egregious harm.

*State of the Evidence*

The second factor requires us to review the state of the evidence, including the contested issues and weight of probative evidence. *Villarreal*, 453 S.W.3d at 433. Under this factor, "we look to the state of the evidence to determine whether the evidence made it more or less likely that the jury charge caused appellant actual harm." *Arrington*, 451 S.W.3d at 841.

As summarized previously in this opinion, appellant was seen multiple times on the Mikulecs' fenced-off private property by Worsham, the neighbor who lived across the road, who advised appellant that he was on private property. Worsham had observed appellant driving Luke's truck. Both Amy and Luke testified that the keys to Luke's truck were inside the mobile home in their bedroom. In addition, both Amy and Luke testified that their home was kept locked, and Amy testified that when she had last visited the mobile home the week before, both doors of the home were locked. On the day appellant was arrested, he was wearing Luke's military coveralls as well as Luke's hat, which, according to Luke, were inside the mobile home. Jennifer testified that she and her husband owned the property and mobile home where Amy and Luke lived. Jennifer and Danny stated that they did not know appellant, and Jennifer said that she had not given him authorization to be on the property or in the mobile home. Amy and Luke likewise testified that they did not know appellant, did not give him permission to be on the property, and did not give him

15

permission to be in the mobile home. Luke also said that he had not given appellant permission to wear his clothes, drive his truck, or take any property or clothing from the mobile home. In addition, Amy and Luke described the condition of the mobile home upon their return, which reflected that items had been displaced throughout the home. They also detailed the items that were missing from the mobile home, some of which were later recovered by Investigator Kelly from where they were hidden on the property. Furthermore, the record reflects that deputies recovered appellant's wallet from inside the mobile home on the coffee table in the living room. Thus, the record contains ample evidence of appellant's entry into the mobile home, without permission, coupled with the commission of the theft of Luke's clothing or, in the alternative, with the attempt to commit theft of property.

Appellant contends that there was conflicting evidence regarding whether he had the owner's consent to enter the mobile home. However, at trial, Jennifer, the owner named in the indictment; Danny, her husband and co-owner of the property; Amy, their daughter who lived in the mobile home; and Luke, Amy's fiancé, who also lived in the mobile home, all testified that they did not know appellant and did not give him permission to be on the property or in the mobile home. Their testimony was never contested or disputed.

While it is true that there was evidence that appellant told various individuals (Worsham, Jennifer, Danny, and Corporal DeLaRosa) that he had Amy's (or Luke's) permission to be there, his statements are not evidence that he had the effective consent of the owner to enter the mobile home. The testimony of these individuals reflects only that appellant told them that he had Amy's or Luke's permission to be in the home; not that he did in fact have it.[8] The record contains

_____

[8] All of the statements reflecting that Amy or Luke gave appellant permission to be on the property or in the mobile home were presented by the State when the witnesses described their

16

only evidence of conflicting statements that appellant made to others about purportedly having Amy's or Luke's permission when he attempted to explain his presence. Contrary to appellant's contention, these conflicting representations about having authority to be there or permission to enter the mobile home do not raise a material contested issue about whether he in fact had such permission (and thus the effective consent of the owner). Consequently, it cannot accurately be said that the issue of whether appellant had the effective consent of the owner to enter the mobile home was a contested issue at trial.

More importantly, the record reflects that the issue actually contested at trial was whether appellant entered the home and committed or attempted to commit theft. The defense

encounters with appellant:

- Worsham testified that appellant told him that Amy had hired him to "watch the place" and that he was "taking care of stuff" for Amy and Luke;

- Jennifer testified that appellant told her that he was "watching over the place for the owners" (which, as the owner, she disputed);

- Danny testified that appellant told him that Amy had given him the keys and permission "to live there to take care of the place" (which Danny's phone call to Amy refuted);

- Corporal Rene DeLaRosa testified that appellant told him that Amy had given him the keys that morning and that he had her permission to be there (which, again, Danny's phone call to Amy refuted);

- Deputy Darryle Staton testified that Corporal DeLaRosa told him on the scene that appellant had said that he had permission to be at the residence but that he could not remember the name or number of the person who told him he could be there; and

- Investigator Justin Kelly testified that appellant told him that he did not know who lived in the mobile home and also that he did not have permission to be in there.

17

theory advanced at trial was that appellant did not commit theft or attempt to commit theft after entering the mobile home. Instead, appellant suggested through his cross examination of the State's witnesses, particularly the sheriff's deputies and Investigator Kelly, that it was possible that someone else had entered the property on some other occasion and removed the items later recovered by Investigator Kelly. Appellant never contested the evidence indicating that he entered the mobile home. He never disputed the testimony of Jennifer, Amy, or Luke when they explicitly stated that they did not know him or give him permission to be on the property or enter the mobile home; at no point did he cross examine any of these witnesses about these assertions.

After reviewing the evidence and the contested issues at trial, we conclude that the state of the evidence weighs against a finding of egregious harm.

*Arguments of Counsel*

Under this factor, we consider whether any statements made during the trial by the prosecutor, the defense counsel, or the trial court may have exacerbated or ameliorated the error in the jury charge. *Arrington*, 451 S.W.3d at 844.

Regarding the arguments of counsel, the State discussed the various elements of the offense, including the issue of whether appellant lacked the effective consent of the owner when he entered the mobile home. When asserting that the State had met its burden of proving the elements of the offense, the prosecutor referenced the testimony of Jennifer, Amy, and Luke, which reflected that they did not know appellant and did not give him permission to enter the home. The prosecutor also argued that "[t]here has been no evidence on [sic] the record, no evidence whatsoever, that he had permission to enter that home." However, the majority of the State's argument focused on the

18

evidence demonstrating the theft element of the burglary. The prosecutor maintained that the evidence demonstrated that appellant committed theft of Luke's clothing (as shown by the fact that appellant was wearing Luke's clothing when he was caught on the property) as well as appellant's attempt to commit theft (as indicated by the displacement of items throughout the home and the fact that property items had been removed from the home). In the State's rebuttal argument, the prosecutor discussed appellant's various statements asserting that he had permission to be in the mobile home (those made to Worsham, Jennifer, Danny, and Corporal DeLaRosa). However, the references to appellant's statements were made in the context of attacking appellant's credibility to suggest that his story changed over time because "[h]e got caught" not in arguing about the element of the owner's consent. Therefore, although the State discussed the lack of effective consent element and referenced appellant's conflicting representations to witnesses, the prosecutor did not connect any elements of the offense, including the lack of consent element or the theft element, to any culpable mental state definition.

In a similar manner, defense counsel's closing argument focused on the failure of the evidence to demonstrate that appellant committed theft. Counsel argued that appellant's conduct in changing into Luke's clothing "[was] nothing that amount[ed] to theft." Counsel also asserted that the ownership of the property was "not an issue" but did not address whether the undisputed owner gave effective consent for appellant to enter the mobile home. At one point, defense counsel discussed the issue of "authority" to be there, but, like the State, only in the context of appellant's various "inconsistent type of statements." Defense counsel made no reference to appellant's culpable

19

mental state, or lack thereof, nor did he connect any elements of the offense, including the theft element, to any culpable mental state definition.

In sum, we perceive nothing in the closing arguments or other statements by the parties or the trial court during trial that exacerbated the trial court's failure to tailor the mens rea definitions in the abstract portion of the jury charge. Neither the State nor defense counsel highlighted or relied on the erroneous jury charge instruction; neither party erroneously applied (nor even discussed) the culpable mental states in connection with the conduct elements of the offense. The arguments of counsel weigh against a finding of egregious harm.

*Other Relevant Information in the Record*

As to the fourth factor, our review of the record has disclosed no other relevant information that requires our consideration in the egregious harm analysis.

*Conclusion Regarding Harm*

After reviewing the record and considering the relevant factors, we hold that the trial court's failure to tailor the definitions of the culpable mental states to the relevant conduct elements of the offense in the abstract portion of the jury charge did not egregiously harm appellant. We overrule appellant's first point of error.

**Challenges to Court Costs**

When the trial court pronounced appellant's sentence in open court, the court ordered appellant to pay $291.00 in court costs. Subsequently, the trial court's written judgment of conviction ordered appellant to pay court costs in the amount of $291.00. In two points of error,

20

appellant challenges the trial court's imposition of court costs against him. In his second point of error, he contends that the trial court erred by imposing court costs against him because he is indigent. In his third point of error, he asserts that the statutes requiring the assessment of court costs against indigent criminal defendants are unconstitutional as applied to him because they violate his right to equal protection.

### Challenge Based on Indigence

In his second point of error, appellant argues that the various fees and costs imposed by the trial court should not have been assessed against him because he is indigent.

Court costs are pre-determined, legislatively mandated obligations resulting from a conviction. *Abney v. State*, No. 03-15-00421-CR, 2016 WL 3361177, at *1 (Tex. App.—Austin June 10, 2016, no pet.) (mem. op., not designated for publication); *Houston v. State*, 410 S.W.3d 475, 477–78 (Tex. App.—Fort Worth 2013, no pet.); *see Johnson v. State*, 423 S.W.3d 385, 389 (Tex. Crim. App. 2014). The Texas Code of Criminal Procedure requires that a convicted defendant pay court costs. *See* Tex. Code Crim. Proc. arts. 42.15, 42.16; *Johnson*, 423 S.W.3d at 389. The imposition of court costs upon a criminal defendant is a "nonpunitive recoupment of the costs of judicial resources expended in connection with the trial of the case." *Johnson*, 423 S.W.3d at 390 (quoting *Armstrong v. State*, 340 S.W.3d 759, 767 (Tex. Crim. App. 2011)). Only statutorily authorized court costs may be assessed against a defendant. *Id.* at 389; *see* Tex. Code Crim. Proc. art. 103.002. Court costs, as reflected in a certified bill of costs, need not be orally pronounced or incorporated by reference into the written judgment to be effective. *Johnson*, 423 S.W.3d at 389 (citing *Armstrong,* 340 S.W.3d at 766–67); *Weir v. State*, 278 S.W.3d 364, 367 (Tex. Crim. App.

21

2009). Consequently, a defendant may raise a claim challenging the bases of the assessed court costs for the first time on appeal.[9] *Johnson*, 423 S.W.3d at 391.

Several intermediate courts of appeals—including this Court—have determined that a defendant's ability to pay is not relevant to the imposition of legislatively mandated court costs, and, thus, have concluded that an indigent defendant can be assessed court costs. *See Rivers v. State*, No. 13-16-00407-CR, 2017 WL 2492610, at *1–2 (Tex. App.—Corpus Christi June 8, 2017, no pet.) (mem. op., not designated for publication); *Stroud v. State*, No. 09-14-00439-CR,

---

[9] The Court of Criminal Appeals has consistently held in the context of court-cost challenges that a defendant may not be faulted for failing to object when he was simply not given the opportunity to do so. *London v. State*, 490 S.W.3d 503, 507 (Tex. Crim. App. 2016); *Johnson v. State*, 423 S.W.3d 385, 390–91 (Tex. Crim. App. 2014); *Wiley v. State*, 410 S.W.3d 313, 321 (Tex. Crim. App. 2013); *Landers v. State*, 402 S.W.3d 252, 255 (Tex. Crim. App. 2013). The Court has explained that a defendant may generally challenge the imposition of even mandatory court costs for the first time on direct appeal when those costs are not imposed in open court and the judgment does not contain an itemization of the imposed court costs. *London*, 490 S.W.3d at 507; *Johnson*, 423 S.W.3d at 390–91. The Court reasoned that procedural default is premised on both a defendant's knowledge of an issue and the failure to challenge it. *London*, 490 S.W.3d at 507; *Riles v. State*, 452 S.W.3d 333, 337 (Tex. Crim. App. 2015). The Court observed that enforcing a procedural-default rule against a defendant who had no opportunity to raise an objection in the trial court does not further any of the policies underlying procedural default. *London*, 490 S.W.3d at 507; *see Gillenwaters v. State*, 205 S.W.3d 534, 537 (Tex. Crim. App. 2006) (delineating policy reasons for requiring complaints to be raised in trial court).

We note that in this case appellant was given an opportunity to object in the trial court. The payment of $291.00 in court costs was ordered during the pronouncement of sentence, and the itemized bill of costs was filed before appellant filed his motion for new trial. *Contra Johnson*, 423 S.W.3d at 390–91 (recognizing that defendants may not have opportunity to recognize basis to object to imposition of court costs and holding that appellant need not have objected at trial to raise claim challenging bases of assessed costs on appeal). We further note that appellant does not challenge the basis of the court costs imposed, but rather the imposition of court costs at all given his indigence. *Contra id.* at 390 (explaining that if defendant challenges court costs on appeal, appellate courts determine whether there is legal basis for costs). However, we will *assume arguendo* that appellant properly raises for the first time on appeal his claim that the trial court erred by imposing court costs against him notwithstanding his indigence.

22

2016 WL 3136148, at *6 (Tex. App.—Beaumont June 1, 2016, no pet.) (mem. op., not designated for publication); *Hernandez-Prado v. State*, No. 03-15-00289-CR, 2016 WL 3144098, at *13 (Tex. App.—Austin May 26, 2016, pet. ref'd) (mem. op., not designated for publication); *Allen v. State*, 426 S.W.3d 253, 258–59 (Tex. App.—Texarkana 2013, no pet.); *Owen v. State*, 352 S.W.3d 542, 546 (Tex. App.—Amarillo 2011, no pet.). Appellant acknowledges these authorities but argues that they "must be reconsidered" in light of the Texas Supreme Court's decision in *Campbell v. Wilder*. *See* 487 S.W.3d 146, 152 (Tex. 2016).

In *Campbell*, six petitioners filed suit for divorce and each also filed an uncontested affidavit of indigency pursuant to Rule 145 of the Texas Rules of Civil Procedure.[10] *Campbell*, 487 S.W.3d at 148.; *see* Tex. R. Civ. P. 145. Despite each petitioner having established indigency, the trial court allocated costs to the petitioners in their final decree of divorce. *Campbell*, 487 S.W.3d at 148. In discussing the application of Rule 145 in a family court proceeding, the Texas Supreme Court stated that "it is an abuse of discretion for any judge, including a family law judge, to order costs in spite of an uncontested affidavit of indigence." *Id.* at 152 (internal citation omitted). Based on this phrase, appellant argues that the trial court here erred in assessing court costs against him in this case because he, too, is indigent. However, appellant's reliance on *Campbell* is misplaced.

First, unlike the petitioners in *Campbell*, appellant is not a civil litigant, and his proceeding is not governed by the Texas Rules of Civil Procedure. *See* Tex. R. Civ. P. 2 ("[t]hese rules shall govern the procedure . . . in all actions of a civil nature"). Instead, the Texas Code of

---

[10] Rule 145 provides that "[a] party who files a Statement of Inability to Afford Payment of Court Costs cannot be required to pay costs except by order of the court as provided by this rule." Tex. R. Civ. P. 145(a).

23

Criminal Procedure applies to appellant's criminal proceeding. *See* Tex. Code Crim. Proc. art. 1.02 ("[t]he procedure herein proscribed shall govern all criminal proceedings"). Under the Code of Criminal Procedure, the imposition of court costs is mandatory upon conviction. *See id.* arts. 42.15 ("When the defendant is fined, the judgment shall be that the defendant pay the amount of the fine and all costs to the state."), 42.16 ("If the punishment is any other than a fine, the judgment . . . shall adjudge the costs against the defendant, and order the collection thereof . . . .").

Second, as the *Campbell* court noted, one of the purposes of Rule 145 is to ensure that indigent individuals will have access to the courts by preventing the imposition of costs in certain circumstances. *See* 487 S.W.3d at 152; *see also Martinez v. State*, 507 S.W.3d 914, 918 (Tex. App.—Waco 2016, no pet.) (""[I]f not for the provisions of Rule 145, an indigent person, seeking the remedies afforded to non-indigent persons through the civil courts, would be prevented from accessing the courts."). However, "[i]ndigent criminal defendants face no such barrier. In fact, indigent criminal defendants are in court solely because of a criminal charge brought by the State, and court costs are not assessed[ ] unless a conviction is obtained." *Martinez*, 507 S.W.3d at 918. Thus, criminal defendants are not deprived of access to the courts because they are not assessed court costs until after they are convicted, if they are convicted. *See Gonzalez v. State*, No. 08-16-00257-CR, 2018 WL 1312945, at \*3 (Tex. App.—El Paso Mar. 14, 2018, no pet.) (mem. op., not designated for publication).

Because appellant is a criminal defendant and not a civil party, we conclude that *Campbell* is not applicable here. *Campbell* involved the assessment of court costs against indigent civil litigants in divorce proceedings, *see Campbell*, 487 S.W.3d at 148; it has no application in the

context of indigent criminal defendants in a criminal proceeding. *See Rivers*, 2017 WL 2492610, at *1–2; *Gonzalez*, 2018 WL 1312945, at *1–3. We decline appellant's request to extend *Campbell's* holding to this criminal proceeding, particularly in the face of contrary statutory provisions. The assessment of court costs upon conviction is legislatively mandated, *see* Tex. Code Crim. Proc. arts. 42.15, 42.16, and appellant provides no authority to except indigent criminal defendants.

For these reasons, we conclude that the trial court did not err in assessing court costs against appellant despite his financial indigency. We overrule appellant's second point of error.

### As Applied Equal Protection Challenge

In his third point of error, appellant argues that the statutes authorizing the assessment of court costs against criminal defendants are unconstitutional as applied to him because they violate his right to equal protection.[11] Specifically, appellant argues that his equal protection rights are violated by these statutes because court costs are not assessed against indigent parties in civil proceedings. He maintains that "no rational basis" justifies treating indigent criminal defendants differently than indigent civil parties—that is, for requiring indigent criminal defendants to pay court costs but excusing indigent civil litigants from doing so.

A claim that a statute is unconstitutional "as applied" is a claim that the statute, although generally constitutional, operates unconstitutionally as to the claimant because of his

---

[11] We note that appellant raises his constitutional as applied challenge to the statutes mandating court costs for convicted criminal defendants for the first time on appeal. The Court of Criminal Appeals has concluded that an as applied constitutional challenge to a statutorily imposed fee may be raised on appeal, even when it was not raised in the trial court, when the record is sufficient to consider the constitutional claim. *London*, 490 S.W.3d at 510. Thus, we will *assume arguendo* that appellant properly raises this constitutional claim for the first time on appeal.

particular facts and circumstances. *State ex rel. Lykos v. Fine*, 330 S.W.3d 904, 910 (Tex. Crim. App. 2011) (orig. proceeding); *Gillenwaters v. State*, 205 S.W.3d 534, 537 (Tex. Crim. App. 2006); *Ex parte Carter*, 514 S.W.3d 776, 779 (Tex. App.—Austin 2017, pet. ref'd). A statute may be valid as applied to one set of facts and invalid as applied to a different set of facts. *Lykos*, 330 S.W.3d at 910; *Friesenhahn v. State*, No. 03-16-00582-CR, 2018 WL 828959, at *3 (Tex. App.—Austin Feb. 9, 2018, no pet.) (mem. op., not designated for publication).

We review a challenge to the constitutionality of a statute de novo. *Vandyke v. State*, 538 S.W.3d 561, 570 (Tex. Crim. App. 2017); *Salinas v. State*, 464 S.W.3d 363, 366 (Tex. Crim. App. 2015). The party challenging the statute normally bears the burden of establishing its unconstitutionality. *Vandyke*, 538 S.W.3d at 570–71; *Peraza v. State*, 467 S.W.3d 508, 514 (Tex. Crim. App. 2015); *Ex parte Lo*, 424 S.W.3d 10, 15 (Tex. Crim. App. 2013); *see Schlittler v. State*, 488 S.W.3d 306, 313 (Tex. Crim. App. 2016), *cert. denied*, 137 S. Ct. 1336 (2017) ("An individual bringing a challenge to a criminal statute must 'shoulder the burden to establish that [the statute] is unconstitutional.'" (quoting *Luquis v. State*, 72 S.W.3d 355, 365 (Tex. Crim. App. 2002))). When confronted with an attack on the constitutionality of a statute, we afford great deference to the Legislature and presume that the statute is constitutional and that the Legislature has not acted unreasonably or arbitrarily. *Vandyke*, 538 S.W.3d at 570; *Peraza*, 467 S.W.3d at 514; *Ex parte Lo*, 424 S.W.3d at 14–15; *State v. Rosseau*, 396 S.W.3d 550, 557 (Tex. Crim. App. 2013); *see* Tex. Gov't Code § 311.021 (stating that courts presume "compliance" with Texas and United States Constitutions). Bearing in mind this presumption, we examine the statutory provisions mandating the assessment of court costs against criminal defendants upon conviction and the various statutes

26

assessing costs and fees that appellant complains of together with the constitutional right that appellant contends they offend.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *Schlittler*, 488 S.W.3d at 316; *see* U.S. Const. amend XIV; *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *accord Estes v. State*, — S.W.3d —, No. PD-0429-16, 2018 WL 2126740, at *3 (Tex. Crim. App. May 9, 2018); *Rosseau*, 396 S.W.3d at 557. "A threshold for asserting an equal-protection challenge is demonstrating that a classification discriminates among similarly situated individuals." *Friesenhahn*, 2018 WL 828959, at *3 (quoting *Modarresi v. State*, 488 S.W.3d 455, 467–68 (Tex. App.—Houston [14th Dist.] 2016, no pet.)); *see Smith v. State*, 898 S.W.2d 838, 847 (Tex. Crim. App. 1995); *see also Estes*, 2018 WL 2126740, at *11 (Newell, J., concurring in part & dissenting in part) (to prevail on equal protection claim, party complaining "must show he was treated differently than other similarly situated individuals due to a particular legislative classification"); *Downs v. State*, 244 S.W.3d 511, 518 (Tex. App.—Fort Worth 2007, pet. ref'd) (to prevail on equal protection claim, party complaining "must establish [that] the party was treated differently than other similarly situated parties"). Thus, our initial inquiry when reviewing an equal protection argument is whether the challenged statute treats similarly situated persons differently. *Friesenhahn*, 2018 WL 828959, at *3; *Barker v. State*, 335 S.W.3d 731, 734 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd); *see Nonn v. State*, 117 S.W.3d 874, 881-82 (Tex. Crim. App. 2003). If it does not, the challenge must fail. *Friesenhahn*, 2018 WL 828959, at *3; *Barker*, 335 S.W.3d at 734; *see Nonn*, 117 S.W.3d at 882.

27

A review of the statutes at issue here demonstrates that the court costs assessed against appellant are those costs required to be paid by any convicted defendant. That is, any defendant must pay the statutory court costs and fees upon conviction—whether the defendant is indigent or not. Therefore, there is no classification in the statutes that treats any persons, including indigent defendants, differently than similarly situated persons: all convicted criminal defendants are subject to the same statutory scheme mandating the imposition of court costs. Thus, they are similarly situated and similarly treated. *See, e.g.*, *Smith*, 898 S.W.2d at 847 ("In this instance appellant's equal protection complaint is not among similarly situated individuals, that is, he is treated the same as all capital defendants.").

To support his argument that indigent criminal defendants are similarly situated but differently treated by the assessment of court costs (and thus should not be assessed court costs), appellant compares the various statutes assessing fees and court costs against criminal defendants in criminal proceedings, *see generally* Tex. Gov't Code ch. 102 ("Court Costs in Criminal Proceedings"); Tex. Code Crim. Proc. ch. 102 ("Costs Paid by Defendants"), to similar statutes assessing fees and court costs in civil proceedings, *see generally* Tex. Gov't Code ch. 101 ("Filing Fees and Other Fees and Costs in Civil Proceedings"). Based upon this comparison—together with the indigence exclusion of Rule 145 of the Texas Rules of Civil Procedure and the Texas Supreme Court's holding in *Campbell*, *see* discussion *supra* pp. 23–25—appellant maintains that the statutes assessing court costs in criminal proceedings are unconstitutional because they treat indigent criminal defendants differently than similarly situated indigent civil parties. Thus, appellant's equal protection claim does not argue that indigent criminal defendants are treated differently than other

28

criminal defendants under the statutes mandating court costs. Instead, he argues that they *should* be treated differently because "similarly situated" indigent civil litigants are treated differently. However, appellant fails to demonstrate that indigent criminal defendants and indigent civil litigants are similarly situated. He simply asserts that the two statutory schemes—the statutes imposing costs and fees in criminal proceedings and those imposing costs and fees in civil proceedings—impose "many similar costs and fees." This does not establish that criminal defendants and civil litigants are similarly situated.

Two of our sister courts of appeals have rejected the same claim now made by appellant here based on the conclusion that indigent civil litigants and indigent criminal defendants are not similarly situated persons. *See Rivers*, 2017 WL 2492610, at *2; *Martinez*, 507 S.W.3d at 917. We agree with the reasoning and holdings of our sister courts. As the Waco Court noted, indigence of a civil litigant can prevent access to the courts but indigence of a criminal defendant creates no such barrier. *See Martinez*, 507 S.W.3d at 918. Further, as the court also observed, "indigent criminal defendants are afforded a number of advantages that are unavailable to indigent civil litigants, including the right to court-appointed counsel at trial and on the first direct appeal, *see* U.S. Const. amend. VI; *Gideon v. Wainwright*, 372 U.S. 335, 344–45 (1963); the right to experts, *see Ake v. Oklahoma*, 470 U.S. 68, 76–77 (1985); and the right to a free record on appeal, *see Griffin v. Illinois*, 351 U.S. 12, 18–19 (1956)." *Id.*; *see Gonzalez*, 2018 WL 1312945, at *3 (observing that "civil and criminal parties are not similarly situated, not only due to the nature of proceedings they are involved in, but also because criminal defendants are not assessed costs unless they are convicted of a crime, whereas civil parties may have costs assessed against them without a conviction"). A

review of the nature of the proceedings, the rights involved, and the timing of when (and whether) costs are assessed demonstrates that indigent criminal defendants and indigent civil litigants are not similarly situated.

"[I]t is axiomatic that the Equal Protection Clause does not require things different in fact to be treated in law as though they were the same." *Downs*, 244 S.W.3d at 518; *accord Rivers*, 2017 WL 2492610, at *2; *State v. McNutt,* 405 S.W.3d 156, 162 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd); *see also Smith*, 898 S.W.2d at 847 (stating that "the classification must discriminate against *similarly situated individuals*"). "Differences based on various factual traits, circumstantial nuances, and peculiarities, which by virtue of their differences make them amenable to disparate treatment, are not a basis for an equal protection claim." *Downs*, 244 S.W.3d at 518; *accord Rivers*, 2017 WL 2492610, at *2. Appellant's comparative argument fails to appreciate the factual differences between indigent criminal defendants and indigent civil litigants and the different circumstances and procedures involved in criminal proceedings and civil proceedings.

In sum, because the legislatively mandated court costs apply to all convicted criminal defendants, all similarly situated persons are treated alike under the statutory scheme imposing court costs against criminal defendants upon conviction. Thus, the assessment of court costs against appellant treated him the same as other similarly situated individuals. Further, given the factual and circumstantial differences between indigent civil litigants and indigent criminal defendants, we cannot conclude that indigent criminal defendants and indigent civil litigants are similarly situated. Therefore, appellant's comparative argument fails to demonstrate that he was treated differently than similarly situated persons.

Appellant has not established the threshold element of his equal protection claim—that he received different treatment than similarly situated individuals. Accordingly, appellant has not met his burden of showing that he was denied equal protection of the law through the assessment of court costs, and thus, he has failed to establish that the complained-of statutes are unconstitutional as applied to him. We overrule appellant's third point of error.

## Error in the Written Judgment

On review of the record, we observe that the written judgment of conviction in this case contains non-reversible clerical error. The judgment states that the "Statute for Offense" is "30.02(c)(2) Penal Code." This statutory provision establishes that the offense of burglary of a habitation as alleged in the indictment here is a second degree felony. However, the applicable statutory provisions for the offense for which appellant was convicted also include section 30.02(a)(3) of the Penal Code, the statutory provision that defines the offense of burglary of a habitation as charged in this case.

This Court has authority to modify incorrect judgments when the necessary information is available to do so. *See* Tex. R. App. P. 43.2(b) (authorizing court of appeals to modify trial court's judgment and affirm it as modified); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993) (concluding that Texas Rules of Appellate Procedure empower courts of appeals to reform judgments). Accordingly, we modify the judgment of conviction to reflect that the "Statute for Offense" is "30.02(a)(3), (c)(2) Penal Code."

**CONCLUSION**

We conclude that the error in the trial court's jury charge did not egregiously harm appellant, that the trial court did not err in assessing the legislatively mandated court costs notwithstanding appellant's indigence, and that appellant failed to meet his burden of establishing that the statutes imposing mandatory court costs and fees against criminal defendants upon conviction are unconstitutional as applied to him because they violate equal protection rights. However, we have found non-reversible clerical error in the written judgment of conviction. Accordingly, we modify the judgment as noted above to correct the error and, as modified, affirm the trial court's judgment of conviction.

_____

Melissa Goodwin, Justice

Before Chief Justice Rose, Justices Goodwin and Field

Modified and, as Modified, Affirmed

Filed:   July 3, 2018

Do Not Publish